Shaunda L. McNeill (Bar No. 14468)
Katherine E. Pepin (Bar No. 16925)
Clyde Snow & Sessions
One Utah Center, Thirteenth Floor
201 South Main Street
Salt Lake City, Utah 84111-2216
Telephone:   (801) 322-2516
Facsimile:   (801) 521-6280
Email:         slm@clydesnow.com
                  kep@clydesnow.com

*Attorneys for Plaintiff Kathryn Butler*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KATHRYN BUTLER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY SCHOOL DISTRICT, a governmental entity,<br><br>Defendant. | **COMPLAINT**<br>**(Jury Demand)**<br><br>Civil No. 2:20-cv-00154-TS<br><br>Judge Ted Stewart |

Plaintiff Kathryn Butler ("Plaintiff" or "Ms. Butler"), by and through her attorneys, complains against Salt Lake City School District ("Defendant" or "District") as follows:

### I.   NATURE OF THE CLAIMS

1. This suit is brought by Plaintiff under Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII") and under the Age Discrimination in Employment Act, as amended and codified at 29 U.S.C. § 621, *et seq.* ("ADEA").

2.      Ms. Butler is a 61-year-old female.  While employed by the District at East High School ("East High"), Ms. Butler suffered sex and age discrimination.  As set forth in more detail below, East High Principal Paul Sagers ("Sagers") engaged in a long series of discriminatory and harassing conduct toward Ms. Butler that culminated in her being removed from her position as Athletic Director in favor of a younger, less qualified male.

3.      Plaintiff seeks economic damages, compensatory damages, liquidated damages, punitive damages, interest, and attorneys' fees and costs.

## II.     PARTIES

4.      Plaintiff Kathryn Butler resides in Wasatch County, Utah, and was employed by Salt Lake City School District at all times relevant to the allegations in this Complaint.

5.      Defendant Salt Lake City School District is a Utah governmental entity in Salt Lake County. East High School is a public high school within the jurisdiction of the District.

## III.     JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims because they are brought pursuant to Title VII of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000e, et seq., and the Age Discrimination in Employment Act of 1967, as codified at 29 U.S.C. § 621, et seq.

7.      Venue is proper as all the events giving rise to the claims occurred within the District of Utah.

8.      Ms. Butler has complied with the administrative requirements set forth in 42 U.S.C. § 2000e-5 and 29 U.S.C. § 626(d).  On or about March 14, 2016, Ms. Butler filed a Charge of Discrimination alleging discrimination on the basis of sex and age with the Equal

Employment Opportunity Commission ("EEOC"). A copy of the Charge is attached hereto as Ex. A.

9. Ms. Butler received a Notice of Right to Sue issued by the EEOC on January 15, 2020. A copy of that Notice is attached hereto as Ex. B.

### IV.  GENERAL ALLEGATIONS

10. Ms. Butler has been employed by the District since 1982. She has a Bachelor of Science degree from the University of Utah, where she majored in Physical Education and minored in Health. Ms. Butler also has a Master of Education and Counseling from the University of Phoenix.

11. For the first several years of her employment with the District, Ms. Butler taught high school Health, Body Conditioning, and Physical Education classes. She also coached basketball and volleyball as a head varsity coach for 23 years.

12. In the early 1990s, with the help of Cecie Scharman, who oversaw athletics for the District, Ms. Butler pioneered the new position of Athletic Director ("AD") at District high schools.

13. Before the AD position was created, one assistant principal typically oversaw the athletics program. However, as the breadth and complexity of the athletic programs increased, it became difficult for an assistant principal to manage athletics in addition to their other duties.

14. The AD position was attractive to the District because an AD essentially functions as administrator but is paid only a teacher's salary.

15. ADs work closely with the District AD, the assistant principal assigned to assist them, the principal, and coaches.

16. ADs oversee all aspects of a school's athletic program, including certifications, budgets, transportation, scheduling officials, publicity, scholarships, player eligibility, setting up for games, managing First Aid/CPR certification of coaching staff, participating in District AD meetings, and attending and supervising all home games.

17. Principals were in charge of all athletic transfer issues and had the final say on any coaching staff issues and eligibility issues.

18. The District funded a .5 FTE (full time equivalent) position, and the high schools matched with another .5 FTE position. At most schools, these positions were divided between two ADs (one for the men's program and one for the women's program) who also carried a .5 FTE teaching load.

19. Ms. Butler served as AD at East High from 1991 to 2015. During those years, she made herself indispensable by ensuring that all athletic programs ran smoothly in coordination with the school's other programs and with the Utah High School Athletic Association ("UHSAA"). She also ensured that the athletic programs met student needs and that athletic resources were equitably divided among men's and women's programs.

20. Ms. Butler was one of the first female ADs in the State of Utah. Beginning in 2006, Ms. Butler became one of the first ADs to oversee both the men's and women's athletic programs at a Utah high school. Even though she oversaw both men's and women's athletic programs, she was only assigned as a .5 FTE AD, with her other .5 FTE based on teaching duties.

21. In 2010, of her own initiative, Ms. Butler became a Certified Athletic Administrator ("CAA") with the National Interscholastic Athletic Administrators Association ("NIAAA").

22. The CAA qualification is a national board certification that requires an applicant, among other things, to take numerous leadership courses, to pass the CAA examination, to meet educational and work experience requirements, and to abide by certain ethical standards. Few high school ADs have this qualification.

23. In 2010, as a result of Ms. Butler's CAA certification and the quality of the athletic programs she administered, NIAAA rated East High's athletics programs as "exemplary," which is the highest rating possible.

24. In 2011, Ms. Butler received Utah's Athletic Director of the Year Award from the Utah Interscholastic Activities and Athletic Association (UIAAA).

25. In 2007, Paul Sagers was transferred to East High as the new principal.

26. Ms. Butler and Mr. Sagers had known each other for several years and had previously worked together. At first, their relationship with cordial and functional.

27. However, over time, it became clear to Ms. Butler that Mr. Sagers expected females to adhere to his will and that he would retaliate against any female staff member who confronted him. In fact, Mr. Sagers has a history of treating female employees punitively when they disagree with him, resist his demands, confront, complain, or seek an accommodation.

28. It also became clear to Ms. Butler that Mr. Sagers viewed her as expendable, despite her long tenure with the District, her work in creating the AD role, her credentials, and the awards she and the East High athletic program had received.

29. Mr. Sagers repeatedly undervalued Ms. Butler in comparison with male staff members and repeatedly pressured her to sacrifice her career to the benefit of male staff members.

30. In 2010, when Ms. Butler was only 50 years old, Mr. Sagers pressured her to retire. Mr. Sagers wanted to hire Brandon Matich, a younger male, as the new football coach, but Mr. Matich would only accept the job if it were tied to a full-time (1.0 FTE) contract. Mr. Sagers came up with a scheme in which Ms. Butler would sacrifice her 401(k) savings and income so that Mr. Matich could assume her teaching duties in addition to the football coaching duties and therefore be hired full-time.

31. Mr. Sagers promised Ms. Butler that after retiring, she could re-apply for the AD position, which would be a .5 FTE position. Mr. Sagers promised that even though the position would be posted and others could apply, he would hire her because she would be the most qualified applicant.

32. Mr. Sagers also promised that he would try to increase Ms. Butler back to a full-time contract as soon as possible.

33. At the time she was pressured to retire, Ms. Butler had worked 28.5 years for the District. She was eligible to retire after 30 years of service.

34. In order to retire early, Ms. Butler had to use $47,000 from her 401(k) retirement savings to buy out her final year-and-one-half of work. The buy-out was Mr. Sagers' idea, and he pressured Ms. Butler to agree to it.

35. At the time she retired, Ms. Butler did not understand the burdensome out-of-pocket health premiums she would have to pay.

36.     Mr. Sagers did not explain that, due to State retirement and rehiring policies, Ms. Butler would have to re-apply for her part-time position three times during the first year following her retirement, until a continuing contract could be signed.  Nor did he explain that she would have to become ESL certified, which required approximately 2-4 hours of coursework per week (uncompensated) for approximately two years.

37.     Mr. Sagers and other administrators wrote glowing recommendations for Ms. Butler in support of her application to be re-hired.

38.     Ms. Butler was rehired as AD into a six-month hourly position, at the conclusion of which she had to re-apply for a .50 contract AD position.  At the end of the school year, she had to re-apply again for a nine-month contract.

39.     Mr. Sagers never made an effort to restore Ms. Butler to a full-time contract.

40.     It was impossible for Ms. Butler to adequately perform all the duties of AD on a part-time schedule.  As a result, she worked far more hours than her contract with the District compensated her for.

41.     Ms. Butler's regular hours on campus were 8:00am to 2:30pm on Monday and 10:00am to 2:30pm on Tuesday, Wednesday, Thursday, and Friday.  Thus, Ms. Butler regularly spent 31 hours on campus during the regular workweek.

42.     In addition, Ms. Butler attended home games, many away games, and all State and Regional playoff games.  These games took place during afternoons and evenings.

43.     In addition, Ms. Butler worked from home in the early mornings, afternoons, and evenings.  She responded to emails, made phone calls, prepared schedules, prepared student

excusals for games to faculty, scheduled buses, scheduled officials, and performed many other tasks while at home.

44. Ms. Butler made herself available at all hours by email, by cell phone, and through the radio she carried on and off campus.

45. Ms. Butler worked well in excess of 20 hours per week but was only compensated based on .5 FTE, plus a small stipend equivalent to an additional 26 days per year.

46. In 2012, due to the success of East High's football team, the eligibility of the players came under scrutiny when the principal of Highland High School filed a complaint with the Utah High School Athletic Association (the "Athletic Association").

47. Following an investigation, four East High players were found to be ineligible to be on the football team.

48. Although Mr. Sagers and football coach Brandon Matich were primarily responsible for the violations, Ms. Butler was prepared to accept shared responsibility as a team player.

49. However, shared responsibility was not good enough for Mr. Sagers. Mr. Sagers instructed Ms. Butler to accept sole responsibility for the violations and to tender her resignation as a peace offering in the hope that East High would still be allowed to compete in the State Championship despite the eligibility violations.

50. Mr. Sagers drafted a letter for Ms. Butler to sign in which she apologized to the Athletic Association and offered to resign. He directed Ms. Butler to sign the letter and read it aloud to the Athletic Association.

8

51. Ms. Butler informed her District supervisor, Cecie Scharman, what Mr. Sagers had asked her to read to the Athletic Association. Ms. Scharman instructed Ms. Butler not to read the letter saying she would resign and clarified (as Ms. Butler's supervisor) that the District was not asking Ms. Butler to resign.

52. Ms. Butler signed a modified version of the letter and read it aloud to the Athletic Association.

53. Even with the offer of resignation removed, the Athletic Association and the athletic community at large were incensed that Mr. Sagers had thrust all responsibility onto Ms. Butler, while he and Coach Matich made no public apologies.

54. Following this controversy, the District conducted an audit of student athlete eligibility at all high schools. East High had the fewest number of violations of any school.

55. To punish Ms. Butler for having stood up to him and having refused to fully sacrifice her own career (again) to protect Mr. Sagers and coach Matich, Mr. Sagers became increasingly hostile toward Ms. Butler.

56. Mr. Sagers did everything in his power to make Ms. Butler's life miserable and to prevent her from effectively performing her duties as AD.

57. Even though the AD's duties required Ms. Butler to be available during all hours of the day and to perform work during both business hours and evenings, Mr. Sagers never made good on his promise to reinstate Ms. Butler to full-time (1.0 FTE) status or even to increase her contract to a .67 FTE or .75 FTE.

58. In addition, Mr. Sagers stopped providing Ms. Butler with the support and information she needed to successfully perform her duties as AD. For example, he stopped

meeting with her regarding the athletics program and stopped informing her of new policies and other information relevant to her duties. Mr. Sagers also prohibited Assistant Principal Mary Lane Grisely from assisting Ms. Butler, even though at other high schools it is common for an assistant principal to be assigned to support the AD.

59. Mr. Sagers also made public his disdain for Ms. Butler by disrespecting her at public events. For example, at a 2015 girls' golf banquet, he was required to sit next to her but refused to speak to her and positioned his chair so that his back was toward her.

60. Because of his obvious hostility toward her, Ms. Butler repeatedly asked Mr. Sagers if there was a problem with her job performance. He refused to engage in conversation and simply told her she was doing fine.

61. Per District policy, Mr. Sagers and Ms. Butler met three times each school year for performance reviews known as "collaboratives." During each collaborative, Mr. Sagers gave Ms. Butler effective marks and offered no criticism of her job performance.

62. During their final collaborative on May 28, 2015, Mr. Sagers again gave Ms. Butler effective marks and had no criticism of her job performance. However, he abruptly informed Ms. Butler that he was removing her from her position as AD.

63. Mr. Sagers provided no explanation for his decision to remove Ms. Butler from the AD position that she had held for approximately 25 years and which she, in fact, had pioneered.

64. Mr. Sagers informed Ms. Butler that she would be teaching health – the very teaching position she had been pressured to give up by resigning in 2010.

10

65. Having mistreated Ms. Butler for several years and repeatedly abused his position of power to disadvantage Ms. Butler in favor of younger males, Mr. Sagers finally succeeded in removing her from her career as an AD and causing her to be replaced by a younger, less experienced male.

66. The demotion was highly irregular because none of the assistant principals knew about it in advance.

67. However, Skip Lowe – East High's health teacher and basketball coach who had been coveting the AD position for some time – knew in advance that Ms. Butler was going to be removed and that he would be the next AD.

68. When Missy Mackay-Whiteurs, the AD at Highland High School, learned that Ms. Butler had been removed from the AD position, she was shocked. She conveyed the news to Keith West, the head basketball coach at Highland High School. Mr. West was not surprised because he had learned from Skip Lowe at the Spring Fling basketball event that Ms. Butler would be removed from her position and that Mr. Lowe would be the new AD. The Spring Fling basketball event occurred approximately two weeks before Ms. Butler was informed of the demotion.

69. The AD position was officially posted by email to all East High staff at 12:58pm on Thursday, July 2, 2015.

70. Friday, July 3rd, was observed by the District as a holiday.

71. Applications for the position were due on Monday, July 6th, at 2:00 pm.

11

72. On Monday, July 7th, another email to the East High staff announced that Skip Lowe had been selected as the new AD, on a full-time contract that consisted of .5 FTE for serving as AD and .5 FTE for teaching health.

73. Mr. Lowe is a male who is younger than Ms. Butler, and had no experience as an AD. He also lacked many of Ms. Butler's credentials and certifications.

74. Mr. Lowe was unable to perform his duties as AD within a .5 FTE schedule, while also teaching on a .5 FTE schedule.

75. By or before the 2017-2018 school year, Mr. Lowe's full-time assignment was allocated as .67 FTE for serving as AD and .33 FTE for teaching one health class.

76. On information and belief, beginning in the 2018-2019 school year, Mr. Lowe's only assignment under his full-time contract was to serve as AD.

77. This full-time AD assignment occurred despite the fact that in five years Mr. Sagers never made good on his promise to make Ms. Butler full-time, even with additional teaching responsibilities.

78. Ms. Butler could not endure the humiliation of continuing to work at East High after having been removed from the career into which she had poured her heart and soul for approximately 25 years – only to have the role given to someone far less qualified than her.

79. Ms. Butler transferred to Innovations Early College High School, a public charter school in the District. She continued to receive a .5 FTE base salary but with no additional stipend.

## FIRST CAUSE OF ACTION

**(Sex Discrimination and Hostile Work Environment in Violation of Title VII)**

80. Plaintiff realleges and incorporates by reference the paragraphs set forth above.

81. Mr. Sagers, acting within the scope of his employment, caused Ms. Butler to retire early against her interests, required her to take full responsibility for his and a male coach's mistakes with respect to football player eligibility, failed to provide the information and support she needed to effectively perform her duties, treated her with general hostility, and ultimately removed her from her position as AD.

82. A younger male with inferior credentials was chosen to replace Ms. Butler and was given a full-time contract, which soon became a full-time AD contract.

83. The District discriminated against Ms. Butler on the basis of sex and treated her differently than male employees.

84. Mr. Sagers' actions also created a hostile work environment for Ms. Butler, based on her sex. This hostile work environment continued from 2010 through 2015.

85. As a result of the District's unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, Ms. Butler is entitled to back pay, reinstatement or front pay, compensation for medical costs, compensatory/emotional distress damages, punitive damages, prejudgment and postjudgment interest, and attorneys' fees and costs expended in this action.

## SECOND CAUSE OF ACTION

**(Discrimination in Violation of the Age Discrimination in Employment Act)**

86. Plaintiff realleges and incorporates by reference the paragraphs set forth above.

13

{01654672-2 }

87. Mr. Sagers, acting within the scope of his employment, caused Ms. Butler to retire early against her interests, required her to take full responsibility for his and a male coach's mistakes with respect to football player eligibility, failed to provide the information and support she needed to effectively perform her duties, treated her with general hostility, and ultimately removed her from her position as AD.

88. A younger male with inferior credentials was chosen to replace Ms. Butler and was given a full-time contract, which soon became a full-time AD contract.

89. The District discriminated against Ms. Butler on the basis of age and treated her differently than younger male employees.

90. As a result of the District's discriminatory conduct, Ms. Butler is entitled to recover her lost wages and benefits, as well as prejudgment and postjudgment interest on those amounts.

91. The actions of the District were taken with malice or reckless disregard for Ms. Butler's federally protected rights, and as such, she is entitled to liquidated damages.

92. Ms. Butler is also entitled to recover all attorneys' fees and costs expended in this action.

## REQUEST FOR JURY TRIAL

Plaintiff requests that this matter be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

I. For Plaintiff's lost wages, compensation, and benefits;

II. For reinstatement or front pay;

III.      For economic damages, including medical costs;

IV.      For compensatory damages, including for emotional distress;

V.      For punitive damages;

VI.      For Plaintiff's reasonable attorneys' fees, including expert witness fees;

VII.      For pre-judgment and post-judgment interest at the highest lawful rate; and

VIII.      For costs of court and such other relief as the court deems just and equitable.

DATED this 9th day of March 2020.

                                                    CLYDE SNOW & SESSIONS

                                                    */s/ Shaunda L. McNeill*
                                                    Shaunda L. McNeill
                                                    Katherine E. Pepin

                                                    *Attorneys for Plaintiff Kathryn Butler*

{01654672-2 }