IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KATHRYN BUTLER,<br><br>    Plaintiff,<br><br>v.<br><br>SALT LAKE CITY SCHOOL DISTRICT,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:20-CV-154 TS<br><br>District Judge Ted Stewart |

  This matter is before the Court on Defendant Salt Lake City School District's Motion for Summary Judgment. For the reasons discussed below, the Court will grant the Motion.

I. BACKGROUND

  Plaintiff Kathryn Butler was, at all relevant times, the athletic director at East High School ("East High"), a high school within the Salt Lake City School District (the "District"). She also taught health until 2010. Dr. Paul Sagers was the principal at East High from 2007 to 2015. Plaintiff retired in June 2010. The parties dispute Sagers' involvement in Plaintiff's decision to retire, with Plaintiff asserting that Sagers pressured her to retire[1] and Sagers denying any role.[2] Regardless, Plaintiff's retirement allowed East High to hire its preferred choice of football coach—Brandon Matich—who was able to take over the classes previously taught by Plaintiff since he was endorsed for health.[3]

---

[1] Docket No. 24 Ex. 1, at 25:20–23.

[2] Docket No. 24, Ex. 2, at 68:10–12.

[3] *Id.* at 73:14–19, 78:11–17.

1

After her retirement, Plaintiff applied for the athletic director position she had previously held, which was a half-time position. Sagers recommended Plaintiff and the District hired her.[4] Plaintiff was hired provisionally and then, per District policy, had to re-apply for the position over the next few years until she obtained career status.[5] Sagers recommended her each time. In addition to re-applying, the District required Plaintiff to become ESL certified.[6]

As part of her duties as athletic director, Plaintiff, in conjunction with the coaches and principal, was responsible for determining player eligibility.[7] In 2012, four football players were determined to be ineligible to play during the championships after the school had deemed them eligible to play. This was traumatic for the players involved and affected the entire team.[8] Plaintiff contends that Sagers suggested she resign because of this issue.[9] Sagers disputes that he asked Plaintiff to resign, and Plaintiff ultimately did not. As a result of the player eligibility issue, East High was sanctioned by the Utah High School Activities Association.[10] The Associate Superintendent of the District also issued a letter of reprimand, blaming Plaintiff, Sagers, and Matich for the issue.[11] Despite this, in 2013, Sagers again recommended Plaintiff be

---

[4] Docket No. 24 Ex. 6.

[5] Docket No. 24 Ex. 1, at 41:18–42:11.

[6] *Id.* at 44:17–21.

[7] *Id.* at 53:11–16; Docket No. 24 Ex. 2, at 35:8–36:13.

[8] Docket No. 24 Ex. 1, at 82:1–3; Docket No. 24 Ex. 2, at 103:9–16.

[9] Docket No. 24, Ex. 1, at 82:6–7.

[10] *Id.* at 101:24–102:2; Docket No. 24 Ex. 2, at 104:2–3.

[11] Docket No. 24 Ex. 13.

hired, this time on a permanent basis.[12]  After this incident, Sagers played a more active role in determining player eligibility and continued to find mistakes by Plaintiff in the process.[13]

During the 2014-2015 school year, Sagers stated he had difficulty communicating with Plaintiff and she seemed to be "missing in action."[14]  Sagers communicated with Plaintiff mostly by radio.[15]  Plaintiff admitted that she would sometimes turn her radio down and forget to turn it back up.[16]  While Plaintiff stated that she was always available by phone, she knew that radio was Sagers' preferred method of communication.[17]  Sagers testified that because he could not contact Plaintiff he requested a written schedule from her so he could know where she was,[18] but she failed to provide one.[19]  Plaintiff disputes that Sagers requested a written schedule and,[20] regardless, he would have received a written schedule from her at the beginning of the school year during a meeting Plaintiff held with the coaches, as her schedule was included on the agendas and the agendas show that Sagers was present.[21]

---

[12] Docket No. 24 Ex. 2, at 89:11–13, 104:11–17.
[13] *Id.* at 137:10–141:12, 214:9–11.
[14] *Id.* at 96:11.
[15] *Id.* at 47:5–19.
[16] Docket No. 24 Ex. 1, at 58:17–59:8.
[17] *Id.* at 115:24 ("the radio was his MO")
[18] Docket No. 24 Ex. 2, at 95:21–25.
[19] *Id.* at 91:1–92:9.
[20] Docket No. 24 Ex. 1, at 68:13–18.
[21] Docket No. 33 Ex. N.

Sagers also testified that Plaintiff missed a number of weekly meetings held by the school administration.[22] Plaintiff admits to missing three meetings, the absences for two of which were due to her duties as athletic director.[23] In addition to these issues, Sagers received complaints about buses not being available for athletics.[24] Arranging for busses was also one of Plaintiff's responsibilities as athletic director.[25]

At the end of the 2014-2015 school year, Sagers decided to reassign Plaintiff from being the athletic director to teaching health.[26] Sagers informed Plaintiff of the decision during Plaintiff's end-of-year "collaborative" (a meeting to review and discuss Plaintiff's performance). During that meeting, Sagers marked Plaintiff as "effective" on her performance evaluation.[27] Sagers testified that he believed Plaintiff would be effective in her role as a teacher.[28] He also explained that marking Plaintiff anything less than effective would have triggered a plan of

---

[22] Docket No. 24 Ex. 2, at 92:14–20.

[23] Docket No. 33 Exs. O, FF ¶ 20.

[24] Docket No. 24 Ex. 2, at 144:1–146:24, 147:19–148:15, 149:8–13. Plaintiff mistakenly states that the complaints about bussing were made by the football and basketball coaches (Matich and Lowe) and that those coaches had a role in the adverse action against her. Docket No. 33, at 25. However, Sagers testified that the complaints came from the football and *baseball* coaches. Docket No. 24 Ex. 2, at 149:23–150:7. There is no evidence that the baseball coach played any role in Sagers' decision to reassign Plaintiff. Sagers also identified bussing issues at a softball tournament. *Id.* at 147:19–148:15. There is no indication that the softball coach played any role in Plaintiff's reassignment.

[25] Docket No. 24 Ex. 1, at 16:7, 53:20.

[26] Docket No. 24 Ex. 2, at 133:14–18.

[27] Docket No. 24 Ex. 15.

[28] Docket No. 24 Ex. 2, at 154:18–21.

assistance, which would not have made sense because he was removing Plaintiff from the athletic director position so she would no longer be performing the same duties.[29]

After Plaintiff was reassigned, it was announced that Sagers was relocating to West High School and Greg Maughan became acting principal at East High. Plaintiff requested Maughan reverse Sagers' reassignment,[30] which he declined.[31] Plaintiff then transferred to Innovations High School to teach health.[32] After Plaintiff transferred, Maughan posted the athletic director position through a "priority to present staff," asking for interested employees to apply.[33] Skip Lowe, East High's basketball coach, was the only employee to respond and was hired as the athletic director.[34]

Plaintiff brings claims of sex and age discrimination based on her reassignment from athletic director to health teacher. She also asserts a hostile work environment claim based on Sagers' treatment of her during his tenure as principal.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35] In considering whether a genuine dispute of material fact exists, the Court determines whether a

---

[29] *Id.* at 154:22–157:4, 157:16–158:8.

[30] Docket No. 33 Ex. R.

[31] Docket No. 24 Ex. 14.

[32] Docket No. 24 Ex. 18.

[33] Docket No. 24 Ex. 19.

[34] Docket No. 24 Exs. 19, 20.

[35] FED. R. CIV. P. 56(a).

reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[36] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[37]

### III. DISCUSSION

A.     SEX AND AGE DISCRIMINATION

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[38] The Age Discrimination in Employment Act states that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[39]

Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*,[40] "the plaintiff bears the initial burden of establishing a prima facie case of sex discrimination, whereupon the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason

---

[36] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[37] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[38] 42 U.S.C. § 2000e-2(a)(1).

[39] 29 U.S.C. § 623(a)(1).

[40] 411 U.S. 792, 802–04 (1973).

for the discharge, and then back to the plaintiff to show that the stated reason is pretextual."[41] The same burden-shifting framework applies to Plaintiff's age discrimination claim.[42]

> The plaintiff in both ADEA and Title VII cases bears the initial burden of setting forth a prima facie case of discrimination. The elements of each closely parallel the other. In either case the plaintiff must show: 1) she is a member of the class protected by the statute; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class.[43]

Plaintiff is a member of the classes protected by the statutes, she was qualified for the athletic director position, she was reassigned from that position, and the position was filled by a younger male with arguably inferior credentials. Based upon this, the Court will assume that she has presented a prima facie case.

Next, "the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff."[44] Defendant can meet this "exceedingly light"[45] burden by providing "'admissible evidence' of a 'legally sufficient' explanation for the employment action that raises a genuine issue of material fact 'as to whether [the defendant] discriminated against the plaintiff.'"[46]

---

[41] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).

[42] *See Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010).

[43] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998).

[44] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802)).

[45] *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017) (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011)).

[46] *DePaula*, 859 F.3d at 970 (10th Cir. 2017) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)) (alteration in original).

Sagers testified that he had three primary reasons for the reassignment. First, he described Plaintiff as "missing in action."[47] More specifically, Sagers complained that Plaintiff was unreachable by radio, failed to provide him a written schedule, and missed a number of meetings. Second, Sagers identified issues with Plaintiff's handling of player eligibility. Third, Sagers stated that there were issues with bussing. These are legitimate, nondiscriminatory reasons that support the decision to reassign Plaintiff. Therefore, the burden shifts back to her to demonstrate pretext.

"To establish pretext, [Plaintiff] must present 'evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"[48] "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, we do not look to the plaintiff's subjective evaluation of the situation."[49] The Court must consider whether the employer honestly believed the reasons given for termination and whether the employer acted in

---

[47] Docket No. 24 Ex. 2, at 96:11.

[48] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (quoting *Argo*, 452 F.3d at 1203).

[49] *C.R. England, Inc.*, 644 F.3d at 1044 (internal quotations and citations omitted).

good faith.[50] However, the Court "may not second guess the business judgment of the employer,"[51] or consider whether its reasons were "wise, fair, or correct."[52]

Attempting to demonstrate pretext, Plaintiff attacks the reasons provided by Sagers. Plaintiff asserts that she did provide Sagers a written schedule. In support, Plaintiff points to agendas from yearly meetings she had with the head coaches, which contained her schedule. Plaintiff points to evidence that Sagers also presented at these meetings and therefore would have had access to her schedule. This evidence does not contradict Sagers' testimony because it does not demonstrate that Plaintiff ever responded to Sagers' alleged request that she provide him a written schedule. The schedules Plaintiff claims to have supplied were contained in agendas for the yearly coaches' meeting and were not prepared in response to Sagers' purported request. Further, there is no evidence that Sagers received the agendas, only that he presented at those meetings.

Plaintiff next disputes Sagers' statement that she missed Monday meetings. Plaintiff provides a document listing her work hours for the 2014-2015 school year that shows she missed three Monday meetings and two out of those three absences were due to her work as athletic director. Again, this evidence does not contradict Sagers' testimony. While there may have been valid reasons for Plaintiff missing these meetings, it does not change the fact that she was absent from them.

---

[50] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007).

[51] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).

[52] *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal quotations and citations omitted).

Plaintiff also attempts to refute Sagers' claim that she was missing in action by stating that she could have been reached by phone. However, Plaintiff admits that she would turn her radio down and forget to turn it back up, despite being aware that the radio was Sagers' preferred method of communication. Even if Sagers could have made attempts to contact Plaintiff by other means, she was not making herself readily available by the means through which she knew Sagers communicated.

Plaintiff further argues that Sagers could have taken other actions to resolve his concerns about her being "missing in action," like scheduling meetings with Plaintiff, providing her a set schedule, issuing written warnings, or taking disciplinary action. This argument essentially asks the Court to second-guess Sagers' judgment, which it cannot do. Sagers had legitimate, non-discriminatory reasons for his decision to reassign. It is not the Court's role to determine whether Sagers could or should have been taken other steps.

Plaintiff goes on to attack the other two reasons provided by Sagers' to support his decision to reassign Plaintiff: issues with player eligibility determinations and bussing. With respect to player eligibility, Plaintiff argues that her errors were "in only a fraction of the calculations" and that Sagers testified that eligibility issues were not the primary reason for reassignment.[53]

Plaintiff is correct that there were only a small number of eligibility issues. However, both Plaintiff and Sagers testified that these issues were serious to the students who were deemed

---

[53] Docket No. 33, at 25.

10

ineligible, the teams for which they played, and the school itself.[54] Thus, even though the errors were not large in number, they were nevertheless serious and had wide-ranging repercussions.

Similarly, Plaintiff argues that there were a small number of bussing issues and that there were reasons unrelated to her as to why a bus may not arrive. Again, Plaintiff is correct that there were a small number of issues, but those issues were still important. While the bussing concerns, like the eligibility issues, were not the primary reason for Sagers' decision, they added to his reasons for reassignment.[55]

Plaintiff makes a number of other arguments in an attempt to demonstrate pretext. First, she argues that Skip Lowe was preselected to replace her as athletic director. Plaintiff points to nothing more than inadmissible hearsay and speculation to support this assertion. Such evidence is insufficient to withstand summary judgment.[56]

Second, Plaintiff argues that Sagers' explanation for rating her effective—that he believed she would be effective as a health teacher—is not credible. However, Plaintiff oversimplifies Sagers' explanation. Not only did Sagers testify that he believed Plaintiff would be effective teaching health, he also stated that rating her anything less than effective would have triggered a plan of assistance. Sagers did not believe this was appropriate given the fact that Plaintiff was to be reassigned. There was no need for a plan of assistance to remedy the issues that led to the reassignment since Plaintiff would no longer be performing the duties that resulted in those issues.

---

[54] Docket No 24 Ex. 1, 82:1–3; Docket No. 24 Ex. 2, at 141:20–142:4.

[55] Docket No. 24 Ex. 2, at 144:1–146:24, 147:19–148:15, 149:8–13.

[56] *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) ("Speculation . . . will not suffice for evidence.")

Plaintiff also argues that Defendant produced a tampered version of Plaintiff's performance review. Defendant did produce a version of the review without the effective rating shown. It is unclear how this version of Plaintiff's review came into being. However, there is nothing to support the notion that the production of this document in this case was in any way related to Sagers' decision to reassign Plaintiff. There is no dispute that Sagers rated Plaintiff as effective during Plaintiff's last collaborative with him. Had Defendant produced a performance review with a different rating, Plaintiff's argument might have more weight, but that is not what happened. How and why the document came into existence remains a mystery, but it does not demonstrate pretext.

Plaintiff's final argument is that Sagers' statement that he did not consult with anyone before making the decision to reassign her[57] is inconsistent with his overall philosophy of being a "very participatory"[58] principal and is disputed by Maughan, who declined to reconsider Sagers' decision. Sagers explained that his general philosophy of being a participatory principal was not necessarily related to the reassignment process,[59] which is governed by a written agreement between the school district and the teachers' union.[60] Thus, Sagers' statement that he did not consult with anyone about his decision to reassign Plaintiff is not contradictory.

Plaintiff also points to a statement from Greg Maughan (who became acting principal after Sagers transferred to West High) when he declined to reinstate Plaintiff as athletic director.

---

[57] Docket No. 24 Ex. 2, at 176:14.

[58] *Id.* at 11:10.

[59] *Id.* at 184:8–12.

[60] Docket No. 24 Ex. 5.

Maughan stated that "[t]he decision to reassign [Plaintiff] was made after careful consideration and collaboration with the administrative team."[61] This statement could be read as suggesting that Sagers did consult with others before making his decision. But it could also be read to suggest that the administrative team concurred with Sagers' decision after it was announced, which is consistent with Sagers' testimony.[62] Even if Sagers did consult with others before making the decision to reassign, there is no evidence to support the idea that such consultation renders the reasons given for Plaintiff's reassignment unworthy of belief. Instead, it would provide more support for the notion that there were legitimate, nondiscriminatory reasons for Plaintiff's reassignment by showing that others agreed with Sagers' assessment of Plaintiff's performance. Since Plaintiff has failed to show evidence of pretext, summary judgment will be granted on these claims.

B.    HOSTILE WORK ENVIRONMENT

Title VII requires a plaintiff to file a charge of discrimination within 300 days "'after the alleged unlawful employment practice occurred.'"[63] "A claim is time barred if it not filed within these time limits."[64] However, hostile work environment claims "often involve a series of incidents that span a period of longer than 300 days."[65] The Supreme Court has held that "as long as 'an act' contributing to a hostile work environment took place no more than 300 days

---

[61] Docket No. 24 Ex. 14.

[62] Docket No. 24 Ex. 2, at 184:11–185:18.

[63] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).

[64] *Id.* at 109.

[65] *Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005).

before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising that hostile work environment."[66]

"[W]hen analyzing a hostile work environment claim spanning longer than 300 days '[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.'"[67]  "[T]here must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period . . . ."[68]  "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'"[69]  However, "an employer will not be liable when there is 'no relation' between the pre- and post-limitations acts, or if 'for some other reason, such as certain intervening action by the employer,' the later acts are no longer part of the same hostile work environment claim."[70]

Defendant argues that the actions Plaintiff complains of that occurred prior to the limitations period should not be considered because they are not of the same type, were infrequent, and were separated by intervening actions.  The Court agrees.  Plaintiff argues that the Court can consider all the alleged actions because they were all committed by Sagers.

---

[66] *Id.* (citing *Morgan*, 536 U.S. at 117).

[67] *Id.* (quoting *Morgan*, 536 U.S. at 120) (second alteration in original).

[68] *Id.*

[69] *Id.* at 1309 (quoting *Morgan*, 536 U.S. at 120) (second alteration in original).

[70] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (quoting *Morgan*, 536 U.S. at 118).

However, this is not the case. The requirement that Plaintiff repeatedly re-apply for the athletic director position after she was re-hired in 2010 and the requirement to become ESL certified were District requirements, not requirements imposed by Sagers. Similarly, Plaintiff cannot blame Sagers for hiring her as a part-time employee when she knew that the athletic director position was not a full-time position. Further, other than Plaintiff's speculation there is no evidence that Sagers was involved in the decision to hire Skip Lowe as athletic director. Additionally, there is no evidence that Sagers' decision to reassign Plaintiff was related to Sagers' alleged prior efforts to get Plaintiff to retire or his alleged suggestion that she resign. Finally, there are a number of intervening actions and large gaps in time that further strain any connection between these prior events and Sagers' decision to reassign Plaintiff. Therefore, these prior events are barred from consideration.

Even considering all the events of which Plaintiff complains, Plaintiff's hostile work environment claim fails. In evaluating a hostile work environment claim, the Court considers the work atmosphere both objectively and subjectively[71] while keeping in mind that Title VII is not "a general civility code for the American workplace."[72] To that end, "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim."[73] The United States Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of

---

[71] *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).

[72] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

[73] *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

employment."⁷⁴ These standards are "sufficiently demanding" to ensure that they "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."⁷⁵

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."⁷⁶ The harassment's severity and pervasiveness are "evaluated according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."⁷⁷

As stated, Plaintiff complains about Sagers allegedly pressuring her to retire in 2010, re-hiring her as a part-time employee and making her re-apply each year (which was a District policy), requiring her to become ESL certified (again a District policy), allegedly suggesting she should resign after the eligibility issues were discovered, reassigning her, and replacing her with a younger male. Plaintiff also complains that Sagers became rude and aloof toward her after the eligibility issue.⁷⁸ Putting aside the fact that Sagers was not involved in a number of these decisions, Plaintiffs' complaints fail to rise to the level of severity required for a hostile

---

⁷⁴ *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

⁷⁵ *Id.* (internal quotations and citations omitted).

⁷⁶ *Oncale*, 523 U.S. at 81 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

⁷⁷ *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (citations and internal quotation marks omitted).

⁷⁸ Docket No. 24 Ex. 1, at 103:2–104:18, 106:8–9, 108:8–15.

workplace claim.  Instead, Plaintiff points to the type of annoying behavior that is outside the reach of Title VII.  Therefore, this claim fails.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 24) is GRANTED.

DATED this 17th day of June, 2021.

BY THE COURT:

_____
Ted Stewart
United States District Judge
